RECEIVED

BY: _____ Ma ✓

JUL 1 0 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| DEBBIE ARNOLD | CIVIL ACTION NO. 07-1040 |
| VERSUS | JUDGE DONALD E. WALTER |
| THE ANSWER GROUP, INC., U.S. SUPPORT COMPANY and TAG SUPPORT COMPANY | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before this Court is a Motion for Summary Judgment [Doc. #36] filed on behalf of defendants, The Answer Group, Inc., U.S. Support Company and TAG Support Company, and a Motion for Partial Summary Judgment [Doc. #32] filed on behalf of plaintiff, Debbie Arnold, pursuant to Federal Rule of Civil Procedure 56.[1] Both motions are opposed in part and conceded in part. For the reasons assigned herein, both motions are **GRANTED IN PART** and **DENIED IN PART**, and all of plaintiff's claims, except her Title VII retaliation claim, are **DISMISSED**.

---

[1] Also before this Court is defendants' Motion to Strike Affidavits and Other Supporting Documents Filed by Plaintiff, Debbie Arnold [Doc. #57] wherein defendants ask the Court to strike plaintiff's three affidavits filed in support of her Motion for Partial Summary Judgment and in opposition to defendants' Motion for Summary Judgment, the report of Shari Julian, plaintiff's purported expert in "sexual science, victimology and human resources," see plaintiff's Opp. to defendants' Motion in Limine to Exclude Testimony of Julian, p. 1, and an internet criminal records search result. Defendants assert that plaintiff's affidavits are self-serving and contradict her Complaint, interrogatory responses and deposition testimony. Defendants further assert that Dr. Julian does not meet the Daubert requirements, and that the criminal records search has not been authenticated and is inadmissible hearsay.

Defendants' Motion to Strike [Doc. #57] is **GRANTED** to the extent that the Court considered and relies upon only competent summary judgment evidence in reaching its decision with regard to defendants' Motion for Summary Judgment and plaintiff's Motion for Partial Summary Judgment.

## STATEMENT OF THE CASE

Plaintiff, Debbie Arnold ("Arnold"), brings this action against her former employer, defendants, U.S. Support Company ("USSC"), The Answer Group, Inc. ("Answer Group") and TAG Support Company ("TAG") (collectively referred to as "Defendants").[2] Arnold asserts claims of sexual harassment and retaliation under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, et seq., and Louisiana law. Arnold also asserts state law claims of negligent hiring and retention,[3] and conspiracy under La. R.S. 51:2231, et seq. In particular, Arnold asserts that she suffered tangible employment actions, or, alternatively, was subjected to a hostile work environment from approximately May 2005 until her supervisor's termination in November 2006. Arnold further asserts that she was terminated in April 2007 in retaliation for reporting the alleged sexual harassment.

Defendants deny that any sexual harassment occurred but assert that even if Arnold's allegations are true, defendants exercised reasonable care to prevent and promptly correct the allegedly sexually harassing behavior, and Arnold unreasonably failed to take advantage of the preventive and corrective opportunities provided by USSC to avoid harm. Defendants also maintain that plaintiff cannot establish a causal connection between her termination and her sexual harassment

---

[2]In her Motion for Partial Summary Judgment, plaintiff asks the Court to grant summary judgment as to the single integrated enterprise status of U.S. Support Company and The Answer Group, Inc. In their opposition to plaintiff's motion, defendants, for purposes of this suit, do not dispute that they constitute a single integrated enterprise. Thus, plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** as to the status defendants vis à vis each other.

[3]Defendants assert, and Arnold concedes, that her negligent hiring and retention claims are barred by Louisiana Workers' Compensation law. Accordingly, defendants' motion as to plaintiff's negligence claims is **GRANTED IN PART** and the issue warrants no further discussion.

complaint, and that USSC had a legitimate, non-retaliatory reason to terminate Arnold's employment. Defendants further assert that Louisiana law no longer recognizes an employment discrimination conspiracy claim under La. R.S. 51:2231, et seq.

Arnold began her employment with USSC on March 25, 2005, as a security officer at a USSC Call Center facility in Shreveport, Louisiana. Debbie Arnold Deposition ("D. Arnold Depo."), pp. 91-92. On March 25, 2005, Arnold signed a form acknowledging her receipt of the USSC Employee Handbook, "and agreed to abide by the Company's policies, procedures and rules and regulations contained in the handbook." Defendants' Statement of Uncontested Material Facts ("SUF"), ¶7; Plaintiff's Response to Defendants' SUF, ¶7; Plaintiff's Opp., Exh. M, Employee Handbook.[4] Arnold testified in her deposition that she read the Employee Handbook, D. Arnold Depo., p. 92, but denies that USSC ever reviewed the policy with her or explained the policy to her. See Plaintiff's Opp., Exh. A, 5/13/08 Affidavit of Debbie Arnold ("D. Arnold 5/13/08 Aff."), ¶¶4, 44.

The USSC Handbook includes a Harassment Prevention Policy (the "Policy") wherein it states that "[USSC] will not tolerate any form of unlawful harassment against [USSC] employees, whether by executives, managers, co-workers . . ." and prohibits discrimination in employment based upon gender, among other "legally protected characteristic[s] or status." Plaintiff's Exh. M, p. 24. The Policy provides that it "covers conduct in the workplace, during training, at social functions sponsored by the organization . . . and business functions that might occur outside the workplace (such as conventions, trade shows, etc.)." Id.

---

[4]The Court notes that defendants failed to provide the Court a copy of the Employee Handbook in its exhibits. However, plaintiff supplied the handbook in her exhibits filed in opposition to defendants' motion.

The Policy specifically addresses sexual harassment as follows:

Sexual harassment is a problem that deserves special mention. Sexual harassment includes unwelcome sexual advances, requests for sexual favors and all other verbal or physical conduct where submission to such conduct becomes a term or condition of employment or the basis for any employment decision or where the conduct creates an intimidating, hostile or offensive working environment. No supervisor has the authority to grant or deny promotions, or force any change in job status, on the basis of provision or denial of sexual favors.

Sexual harassment is not limited to explicit demands for sexual favors, but also may include such actions as: sex-oriented kidding, teasing or jokes; repeated offensive sexual flirtations, unwelcome advances or propositions; obscene or sexually-oriented language or gestures; display or circulation of obscene or sexually-oriented printed or visual materials; and offensive physical contact such as grabbing, patting, pinching or brushing against another's body.

Any employee who witnesses or experiences conduct which he or she believes to be inconsistent with this policy has a responsibility to report that conduct, in writing (for incident occurring outside normal business hours, e-mail shall suffice), promptly to the Director of Human Resources, Corporate Counsel, or any Vice President. Employees in those situations should take every possible step to make sure that one or more of the persons specified above know their concerns. Only they are authorized to receive and act upon complaints of unlawful harassment or discrimination. This complaint procedure is specifically designed so that employees have a mechanism for bypassing a supervisor he or she believes is engaged in prohibited conduct under this policy. Employees are also expected and encouraged to inform others in the workplace that their conduct is unwelcome or offensive.

All reports describing conduct that is inconsistent with this policy will be promptly and fully investigated. Confidentiality will be maintained to the fullest extent possible. Corrective action will be taken when found to be inappropriate. Violations of this Workplace Harassment policy, as well as any inappropriate conduct that may be found in investigation reports made under the policy, may result in disciplinary action up to and including termination of employment — even if no unlawful harassment occurred.

Employees who report harassment or discrimination, register a complaint pursuant to this policy; or participate in an investigation of harassment or discrimination are protected from any form of retaliation. Employees or supervisors who engage in retaliatory actions against those making reports under this policy are subject to discipline, up to and including termination. In the limited circumstances where an allegation has been made, but there is conclusive evidence that no harassment has

4

occurred and that the allegation was raised purely for retaliatory or other personal reasons, the complaining employee may be subject to disciplinary action, up to and including termination.

Id., at pp. 25-26.

The USSC Employee Handbook also provided for an "Open Door" Policy:

The Company management makes every effort to prevent problems or errors from occurring. If a situation needing attention arises, however, we urge you to bring it to the attention of an Executive or Manager. If you are having difficulties associated with your job or working conditions, then we recommend that you first request assistance from your direct supervisor. However, if you feel that it is not practical for you to refer the matter to your Team Manager; you may seek the assistance of your Floor Manager, the Manager of Human Resources, the Director of Human Resources, or any other Executive. Discussion of problems with other employees who are not in a position to remedy the situation is not helpful to anyone, delays a speedy resolution, and may cause additional problems.

Plaintiff's Motion for Partial Summary Judgment, Exh. C, 10/24/07 Deposition of Paul DiGiorgio ("DiGiorgio 10/24/07 Depo."), Exh. P-3, p. 30.

Arnold asserts that, beginning around April or May 2005, her immediate supervisor, William "Bill" Hutto ("Hutto"), began sexually harassing her by: using sexually offensive language in the presence of, and directed toward, Arnold; touching Arnold in "sexually sensitive areas"; and "forc[ing] [Arnold] to commit lewd sexual acts under the threat and duress of her being fired." Amended Complaint, ¶6.

It is undisputed that on May 4, 2005, Arnold advised her physician, James Hill ("Dr. Hill"), that she was being sexually harassed in the workplace. Defendants' SUF, ¶11; Plaintiff's Response to Defendants' SUF, ¶11. Specifically, plaintiff told Dr. Hill that her supervisor, Hutto, would brush up against her and make inappropriate comments. Id., at ¶12. It is also undisputed that in May 2005 Arnold and a fellow USSC security employee, Brandi Hermann ("Hermann"), arranged to meet with

an attorney to complain about Hutto's alleged harassment. Id., at ¶14.

Sometime in early 2006, Arnold complained to co-employee, Brenda Green ("Green"), that Hutto was sexually harassing her. D. Arnold 5/13/08 Aff., ¶21. According to Arnold, around August 2006, Green told Arnold to report the alleged harassment. D. Arnold Depo., p. 114. On approximately October 13, 2006, Arnold told Ella Harris ("Harris"), USSC Human Resources ("HR") generalist, in a brief conversation, that Arnold was being sexually harassed by Hutto. Id., at pp. 106-11. Harris scheduled a meeting between Arnold and USSC General Manager, David Iadarola ("Iadarola"), on October 24, 2006, at which time Arnold told Iadarola the "full story" of her sexual harassment by Hutto.[5] Id., at pp. 111-12. Gwen Tucker ("Tucker"), another USSC HR generalist, was also present at the October 24-meeting. Id., at p. 162. Iadarola asked Arnold to put her complaint in writing. Iadarola Depo., pp. 23, 25. After Iadarola's meeting with Arnold, he contacted Paul DiGiorgio ("DiGiorgio"), Director of Human Resources and Security for Answer Group and TAG, to relay the information he had received from Arnold. Id., at pp. 28-29.

Arnold took October 25, 2006 off of work. D. Arnold Depo., pp. 162-63. On October 26, 2006, Arnold provided Iadarola, via Harris, a written statement wherein Arnold described incidents involving Hutto of physically forced and verbally coerced oral sex, inappropriate touching, sexually charged comments, innuendo of a relationship between Arnold and Hutto, and threats related to Arnold's employment if she did not comply. Iadarola Depo., p. 30, Exh. D-103; see D. Arnold

---

[5]In his deposition, Iadarola testified that during the October 24-meeting "at no time did [Arnold] say that she actually performed sex with [Hutto]." Plaintiff's Motion for Summary Judgment, Exh. D, Deposition of David Iadarola ("Iadarola Depo."), p. 38. However, Arnold indicated in her deposition that on October 24, she told Iadarola of Hutto's request for oral sex. D. Arnold Depo., pp. 111-12. For purposes of this ruling, the Court will rely upon Arnold's account.

Depo., pp. 163-64. Iadarola sent Arnold's statement to DiGiorgio. Iadarola Depo., pp. 38-39.

On November 1, 2006, DiGiorgio traveled to Shreveport where he conducted interviews of the following USSC employees: Amanda Arnold (plaintiff's daughter), Norbert Saska (IT employee and "friend" of Amanda Arnold), Brenda Green (security guard), Joyce Latchie (security guard), Betty Caesar Hill (security guard), Ella Harris (HR Generalist), Gwen Tucker (HR Generalist), Bill Hutto, another security guard whose name DeGiorgio could not recall, and "Arlen" or "Penny" "in HR." Defendants' Motion for Summary Judgment, Exh. F, 2/1/08 Deposition of Paul DiGiorgio ("DiGiorgio 2/1/08 Depo."), pp. 51-53. Arnold was contacted by either Harris or DiGiorgio[6] and asked to come into the USSC office to discuss her complaint with DiGiorgio. D. Arnold Depo., pp. 247-49. Arnold testified that she refused to speak with DiGiorgio when asked to do so because she was too upset about the alleged manner in which DiGiorgio spoke with Amanda Arnold during her investigative interview. Id. DiGiorgio terminated Hutto's employment with USSC on November 2, 2006. DiGiorgio 10/24/07 Depo., pp. 77-78; Defendants's SUF, ¶50; Plaintiff's Response to Defendants' SUF, ¶50.

After Hutto's termination, Arnold remained employed at USSC in the same position, with the same schedule and at the same rate of pay. Defendants' SUF, ¶52; Plaintiff's Response to Defendants' SUF, ¶52. Joey Hester ("Hester") replaced Hutto as Head of Security for USSC in November 2006. Id., at ¶53. Hester spent twenty-five years with the Shreveport Police Department

---

[6]Arnold first testified in her deposition that "he," referring to DiGiorgio, called her and asked her to come to the office to talk about her complaint regarding Hutto. D. Arnold Depo., p. 247. Arnold then testified that she could not remember whether she spoke with DiGiorgio on the telephone but that she did speak with Harris who asked Arnold to come into the office for the same reason. Id., at pp. 248-49. This seeming issue of fact is not, however, material as the relevance of Arnold's testimony is that she was contacted in connection with the investigation of her sexual harassment complaint against Hutto.

7

before retiring as a lieutenant. Id., at ¶54. Hester currently works for the Shreveport City Marshal and USSC. Id. When Hester was hired, he suggested that USSC hire law enforcement officers in uniform driving marked cars to patrol the facility premises to ensure a law enforcement presence at USSC at all times. Id., at ¶55; Defendants' Motion for Summary Judgment, Exh. G, Deposition of Joey Hester ("Hester Depo."), p. 12. The cost of contracting with police officers forced USSC to reduce its number of in-house security guards. Defendants' SUF, ¶56; Plaintiff's Response to Defendants' SUF, ¶56.

According to Hester, the reduction in force of in-house security guards took place by way of at least three rounds of layoffs.[7] See Hester Depo., p. 35. DiGiorgio testified that he "gave the directive to cut x number of positions." DiGiorgio 2/1/08 Depo., p. 161. For the first round of layoffs, USSC informed Hester that he needed to eliminate 10-15 security guard positions. Defendants' SUF, ¶58; Plaintiff's Response to Defendants' SUF, ¶58. At that time, USSC employed more than 40 in-house security guards. Id. To determine which security guards would be recommended for termination, Hester observed all of the guards and reviewed their personnel files for tenure, education level, and military, police or security backgrounds. Id., at ¶59. Hester, with Tucker present in the room, had a telephone conference with DiGiorgio prior to the third round of layoffs to discuss Hester's recommendations for layoffs. Hester Depo., pp. 62-63. DiGiorgio agreed with Hester's recommendations for each round of layoffs. Id.; DiGiorgio 2/1/08 Depo., p. 161; see Defendants' SUF, ¶66; Plaintiff's Response to Defendants' SUF, ¶66.

---

[7]Arnold contests whether distinct rounds of layoffs occurred but offers no evidence to contradict the sworn deposition testimony of Hester, who states that he recommended which employees to layoff, "terminate[] or whatever the circumstances were," offered by defendants in support of their legitimate, non-retaliatory reason for ending Arnold's employment.

Hester recommended Arnold for termination based on frequent absences, complaints from other officers regarding Arnold being incoherent, cell phone use and failure to patrol. Id., at ¶68. Arnold was terminated on April 25, 2007. Id., at ¶71.

## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. Id. The court must "review the facts drawing all inferences most favorable to the party opposing the motion." Reid v. State Farm Mutual Auto Insurance Co., 784 F.2d 577, 578 (5th Cir. 1986).

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309 (5th Cir. 1999). The moving party need not produce evidence to negate the elements of the non-moving party's case, but need only point out the absence of evidence supporting the non-moving party's case. Celotex Corp., 477 U.S. at 325; Lawrence, 163 F.3d at 311.

Once the moving party carries its initial burden, the burden then falls upon the non-moving

party to demonstrate the existence of a genuine issue of material fact. <u>Matsushita Elec. Indus. Co.</u> <u>v. Zenith Radio Corp.</u>, 475 U.S. 574, 584-88, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). The non-moving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." <u>Wallace v. Texas Tech. Univ.</u>, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. <u>Little</u> <u>v. Liquid Air. Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). In the absence of any proof, the court will not assume the non-moving party could or would prove the necessary facts. <u>Id</u>.

## LAW AND ANALYSIS

I.     **Title VII Sexual Harassment Claim.**[8]

In her Amended Complaint, plaintiff asserts quid pro quo and hostile work environment sexual harassment claims. Amended Complaint, ¶13. Therefore, this Court is guided by the Supervisor Sexual Harassment Road Map provided by the Fifth Circuit in <u>Casiano v. AT & T Corp.</u>, 213 F.3d 278 (5th Cir. 2000), based upon the structure laid out by the United States Supreme Court in <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), that first requires a determination of whether Arnold suffered a tangible employment action.

---

[8]Because Louisiana's relevant anti-discrimination statute, La. R.S. 23:332, is "substantively similar" to Title VII, and Louisiana courts routinely look to federal jurisprudence for guidance, <u>Trahan v. Rally's Hamburgers</u>, 696 So.2d 637, 641 (La. App. 1st Cir. 1997), the outcome of plaintiff's sexual harassment claim will be the same under the federal and state statutes. Therefore, plaintiff's state law discrimination claims will be analyzed only under applicable federal jurisprudence.

A.    Tangible Employment Action.

Arnold asserts that she suffered the following "tangible employment actions" when she refused to provide Hutto sexual favors: (1) temporary reassignments from her supervisor position; (2) belligerent behavior by Hutto; (3) more difficult job assignments; and (4) delay of a "routine annual raise." Arnold also asserts that her submission to Hutto's demands of sexual favors out of fear of losing her job constitutes a "tangible employment action."

The Ellerth Court explained that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." 524 U.S. at 761, 118 S.Ct. at 2268. The Court further emphasized that, in most cases, such an action "inflicts direct economic harm." Id., at 762, 118 S.Ct. at 2269.

This Court finds that while "belligerent behavior" by Hutto directed at Arnold and Hutto's "making [Arnold's] job more difficult" by "hiding [Arnold's] work or sending her on a wild goose chase," see Plaintiff's Opp. to Defendants' Motion for Summary Judgment, pp. 10, 12, may support plaintiff's hostile work environment claim, the individual actions are not, as a matter of law, "tangible employment actions." See Webb v. Cardiothoracic Surgery Associates of North Texas, P.A., 139 F.3d 532, 539 (5th Cir. 1998) (boss' rude or uncivil behavior does not constitute a tangible employment action), overruled on other grounds by Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S.Ct. 2405, 2414, 165 L.Ed.2d 345 (2006). Arnold does not allege that she was ever demoted, reassigned or fired because of these specific actions by Hutto. See Lauderdale v. Texas Dept. of Criminal Justice, Institutional Div, 512 F.3d 157, 164 (5th Cir. 2007).

In asserting that plaintiff's submission to Hutto's sexual harassment constitutes a "tangible

employment action," Arnold asks the Court to follow the Second and Ninth Circuits in Jin v. Metropolitan Life Ins. Co., 310 F.3d 84 (2d Cir. 2002), and Holly D. v. California Institute of Technology, 339 F.3d 1158 (9th Cir. 2003), respectively, wherein they held that a "tangible employment action" occurs when a supervisor threatens the employee with discharge and, in order to avoid the threatened action, the employee complies with the supervisor's demands. Holly D., 339 F.3d at 1167; Jin, 310 F.3d at 94. The Fifth Circuit has not directly confronted this issue.[9]

This Court finds the reasoning and conclusion of Judge Brown in his concurring opinion in Lutkewitte v. Gonzales, 436 F.3d 248, 254 (D.C.Cir. 2004),[10] that Jin, supra., and Holly D., supra.,

---

[9]Defendants rely on Ackel v. National Communications, Inc., 339 F.3d 376 (5th Cir. 2003), for the proposition that the issue before the Court should not be whether an employee's submission to a supervisor's demands is a tangible employment action, but rather whether the alleged harasser is a "proxy" for the employer. In Ackel, supra., one of the plaintiffs alleged that she succumbed to the advances of her employer's president/general manager and engaged in a sexual relationship with him because she was "unable to prevent him from forcing himself on her physically" and because she was "scared of" the president/general manager and "of losing her job." 339 F.3d at 380.

Defendants assert that "[t]he [Ackel] court did not find that [plaintiff's supervisor's] actions . . . constituted a tangible employment action prohibiting the affirmative defense." Defendants' Opp., p. 8. However, defendants base this assertion on the fact that the Ackel plaintiffs argued on appeal that the plaintiff's compliance with her supervisor's sexual advances constituted a tangible employment action but the Fifth Circuit ignored that argument. This Court finds that the Fifth Circuit's opting to "ignore" the issue, as stated by defendants, does not mean that the Fifth Circuit has spoken on the issue one way or the other.

[10]In Lutkewitte, supra, the Court avoided ruling on the legal issue of whether submission to sexual harassment to obtain job-related benefits or to maintain employment is, itself, a tangible employment action. Instead, the Lutkewitte Court assumed the plaintiff's legal theory to be correct, and found the record contained no evidence to link the plaintiff's job-related benefits to her submission, and no evidence that the plaintiff's supervisor "implicitly threatened" the plaintiff "with a loss of job, demotion, or other tangible employment action if she declined to submit to his advances." 436 F.3d at 253. The Lutkewitte Court noted that the supervisor's conduct of unwelcome sexual advances and forced submission to sexual demands was "unspeakably offensive and repulsive, but the coercion that is inherent in a supervisor-employee relationship, without more, is not enough upon which to hold an employer strictly liable for a

"eviscerated the 'tangibility' requirement" by evaluating "tangibility" from the employee's perspective, as opposed to that of the employer. Lutkewitte, 436 F.3d at 269; see also Tobin v. Irwin Mortgage Corp., 2006 WL 861258, *10-11 (N.D.Ill. 2006). This Court finds particularly compelling the reason, as clarified by the Supreme Court in Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed. 204 (2004),[11] for requiring a "tangible" act before imposing strict liability upon on an employer:

> [O]fficial directions and declarations are the acts most likely to be brought home to the employer ... Absent "an official act of the enterprise," as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force. And as Ellerth and Faragher further point out, an official act reflected in company records - a demotion or a reduction in compensation, for example - shows "beyond question" that the supervisor has used his managerial or controlling position to the employee's disadvantage. Absent such an official act, the extent to which the supervisor's misconduct has been aided by the agency relation . . . is less certain. **That uncertainty**, our precedent establishes, **justifies affording the employer the chance to establish, through the Ellerth/Faragher affirmative defense, that it should not be held vicariously liable.**

542 U.S. at 148-49, 124 S.Ct. at 2355 (internal citations omitted and emphasis added).

The reasoning of the Suders Court applies with equal force in a submission case such as this where the employee's compliance with her supervisor's sexual demands maintains the status quo. Without any visible change in Arnold's employment circumstances in the eyes of those "higher up in the supervisory chain," Tobin, 2006 WL 861258, at *10, "[t]he employer has no way of knowing

---

supervisor's sexual harassment." Id. Thus, the appellate court found no error by the trial court in refusing to give the jury the plaintiff's requested tangible employment action instruction, or in denying the plaintiff judgment as a matter of law on her strict liability claim. Id., at 254.

[11]The Suders Court examined this issue in the context of whether strict liability may be imposed upon an employer when a former employee alleges constructive discharge resulting from sexual harassment by supervisors. 542 U.S. at 140, 124 S.Ct. at 2350-51.

that its delegated authority has been brandished in such a way as to coerce sexual submission," Lutkewitte, 436 F.3d at 270. In the absence of any notice of wrongdoing, this Court finds an employer should be allowed an opportunity to establish the affirmative defense provided for by Ellerth/Faragher.

With that finding, the only potentially viable bases for defendants' strict liability are the temporary reassignments of Arnold to other duty posts and alleged delay of an annual raise, both of which, once analyzed, fail to pass muster.

In her Opposition to Defendants' Motion for Summary Judgment, Arnold asserts that each time she refused to provide Hutto sexual favors, she was reassigned from her team leader desk in the security office, also known as the "bubble," to a duty post either outside or at a desk with no chair. Plaintiff's Opp., p. 10; D. Arnold 5/13/08 Aff., ¶36. The former alternative duty post required plaintiff to stand for up to twelve hours straight, and the latter required her to stand for twelve hours with only two fifteen-minute breaks and an hour lunch break at noon. D. Arnold 5/13/08 Aff., ¶36. Id. According to plaintiff, prolonged standing aggravated the medical conditions with which she suffers,[12] fibromyalgia and lupus. Id. Arnold asserts that these reassignments were coupled with taunting from Hutto in the nature of "that'll teach you" and "I'll teach you to mess with me." Id. Green testified in her deposition that she once asked Hutto to allow Arnold to return to her indoor post. Plaintiff's Opp., Exh. J, Deposition of Brenda Green ("Green Depo."), p. 104. According to Green, Arnold returned to her post in the command center after Green fulfilled Hutto's condition of

---

[12] Despite the lack of medical documentation supporting this allegation, the Court will assume, solely for purposes of this ruling, that plaintiff's declared diagnoses are accurate.

providing him a home-cooked meal. Id.[13]

Arnold admits that her pay rate was unchanged as a result of these reassignments. D. Arnold 5/13/08 Aff., ¶38. Arnold has only shown that, at the most, the reassignments caused temporary physical discomfort and an inability to "fulfill [Arnold's] duties as team leader." D. Arnold 5/13/08 Aff., ¶¶36, 38. This Court finds that plaintiff's complaints related to her reassignment amount to mere inconveniences and, thus, do not constitute tangible employment actions. See Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir.1993) (no adverse action where job transfer merely caused personal inconvenience or altered job responsibilities); see Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir.1994) (reassignment to a different position without any reduction in title, salary, or benefits was not adverse employment action although new position involved different duties and was more stressful).

Further, based on the competent summary judgment evidence before this Court, Arnold's allegation that Hutto delayed her annual pay raise is simply untrue. In particular, Arnold asserts that

---

[13]The Court notes that, notwithstanding plaintiff's explanation of "[d]efendants did not ask questions designed to elicit such evidence," Plaintiff's Reply, p. 5, a discrepancy exists between Arnold's deposition testimony and her May 13, 2008 affidavit related to her reassignment to the desk. In her deposition, the following exchange occurred:

Q: . . . did you have your job changed at all after Brandi Herman was gone for good?
A: Yes. I went onto a desk for a while, and then he brought me back into the command center.
Q: **Why did you go on desk?**
A: **I wanted to get out of the command center.**

D. Arnold Depo., p. 226 (emphasis added). Arnold further testified that she wanted to leave the command center "to get away from [Hutto]." Id. This directly contradicts Arnold's allegation as it relates, at least, to her reassignment to a desk duty post that "Hutto intentionally reassigned [her] knowing that it would cause her great pain and discomfort." D. Arnold 5/13/08 Aff., ¶36. Nevertheless, the Court errs on the side of Arnold's version of events solely for purposes of this ruling.

she was entitled to receive an annual pay raise of $0.50 per hour on or around the anniversary of her hire date of March 26, 2006. D. Arnold 5/13/08 Aff., ¶39. According to Arnold, Hutto delayed Arnold's raise because she denied his sexual demands. Id. Arnold asserts that she did not receive her raise until some time after August 2006 when she believes Hutto became aware that someone had reported him for sexual harassment. Id.

Defendants have come forward with uncontroverted evidence that Arnold received her annual pay raise in a timely manner. In support of defendants' Reply to Plaintiff's Opposition,[14] defendants provide the Court DiGiorgio's declaration wherein he explains that:

> In 2005 and 2006, security guards were generally hired at $8.00 per hour and were allowed a $1.00 per hour raise if they passed a concealed weapons test. If the security guard received the $1.00 per hour raise before one year of employment, that employee would be reviewed for a $0.50 per hour raise approximately one year after that date.

Defendants' Reply, Exh. C, Declaration of Paul DiGiorgio ("DiGiorgio Decl."), ¶5. Arnold states that she passed a concealed weapons test and received a $1.00 per hour raise in September 2005. D. Arnold 5/13/08 Aff., ¶39. Consistent with USSC policy, as explained by DiGiorgio, Arnold received her annual $0.50 pay raise in September 2006. DiGiorgio Decl., ¶6; D. Arnold 5/13/08 Aff., ¶39.

For purposes of comparison, defendants also provide the Court the pay records of approximately 12 USSC female and male security guards employed at or around the time of plaintiff's employment. See DiGiorgio Decl., Exh. 1. The records provided show that annual raises were given other USSC security guards in a time frame substantially similar to that experienced by

---

[14]Defendants also provide the same declaration in support of their Motion to Strike, which is incorporated into their Reply to plaintiff's Opposition by reference. See Defendants' Reply, p. 1 n. 1.

Arnold. Id. As plaintiff has failed to come forward with any evidence that her pay raise was delayed, plaintiff cannot show a tangible employment action occurred with respect to her wages.

Finding that plaintiff cannot establish that defendants are strictly liable for her alleged harassment, the Court now turns to plaintiff's hostile work environment claim.

B.    Hostile Work Environment.

At this stage, the Court must examine whether, "[i]f proved, would the actions ascribed to the supervisor by the employee constitute severe or pervasive harassment?" Casiano, 213 F.3d at 284. If the plaintiff fails to raise a triable issue of fact as to whether the harassment was severe or pervasive, the employer faces no vicarious liability. See id. On the other hand, if the conduct could be considered severe or pervasive, the issue will go to the jury *unless* the employer can prove that (1) it exercised reasonable care to prevent and correct promptly any such sexual harassment, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. See id., citing Ellerth, 524 U.S. at 765, 118 S.Ct. at 2270.

The Court assumes, solely for purposes of this ruling, that Arnold has met her burden on summary judgment regarding severe or pervasive harassment by Hutto. Therefore, the issue becomes whether defendants have proven their affirmative defense. This Court finds they have.

1.    *Employer's Exercise of Reasonable Care.*

The Court has before it a copy of defendants' Harassment Prevention Policy which was included in defendants' Employee Handbook. DiGiorgio 10/24/07 Depo., Exh. P-3. This Court also has before it Arnold's sworn deposition testimony that she was provided, acknowledged receipt of and read the Employee Handbook provided by defendants. D. Arnold Depo., pp. 92-93. Arnold

17

further acknowledged that the Harassment Prevention Policy was included in the handbook she received. Id., at p. 94.

It is undisputed that Arnold reported her alleged sexual harassment by Hutto to Harris, a HR generalist, on October 13, 2006. D. Arnold 5/13/08 Aff., ¶21; Defendants' SUF, ¶42. Harris set a meeting between Arnold and Iadarola, USSC General Manager, on or around October 24, 2006, to discuss Arnold's allegations. D. Arnold Depo., p. 111-12. Iadarola told Arnold to put her complaints in writing but Iadarola immediately reported the alleged harassment to DiGiorgio. Defendants' SUF, ¶45; Plaintiff's Response to Defendants' SUF, ¶45. Arnold provided a written statement to Iadarola on October 26, 2006. Id., at ¶46. After DiGiorgio conducted interviews of various employees, Hutto's employment was terminated on November 2, 2006. Id., at ¶¶48, 50.

The only harassment by Hutto that Arnold asserts occurred between her reporting the harassment to Harris and Hutto's termination in November was on October 18, 2006, when Arnold alleges that Hutto confronted her at her trailer home. D. Arnold 5/13/08 Aff., ¶28.[15] Further, Arnold testified in her deposition that after she provided Iadarola her written complaint of sexual harassment on October 26, Hutto said nothing to Arnold at work; he "just sat and stared." D. Arnold Depo., pp. 164-68.

In other words, the evidence before this Court shows that within three weeks of reporting

---

[15]As noted by defendants, whether this encounter involved sexual harassment is questionable as Arnold testified in her deposition that Hutto arrived at her door asking her to sing his praises as a boss in an e-mail to Iadarola. D. Arnold Depo., p. 169. According to Arnold, Hutto made this request/demand based on his concern that Tucker and Glen Mazier were trying to get his job since he was under investigation, "something about a racial thing." Id. The confrontation lasted "maybe 10, 15 minutes at the most." Id., at p. 170. Hutto did not mention Arnold filing a sexual harassment complaint. Id., at pp. 169-70. Again, the Court will look at the facts in the light most favorable to plaintiff, and will, for purposes of this ruling, assume that the October 18 encounter was related to plaintiff's complaints of sexual harassment.

sexual harassment to a HR employee with USSC, Arnold experienced no harassment in the workplace by Hutto[16] and her alleged harasser was terminated.

Plaintiff alleges that defendants' policy was unreasonable based upon USSC's handling of an anonymous sexual harassment complaint against Hutto, received on July 3, 2006. This Court declines to, and need not, comment on the reasonableness of defendants' investigation of this complaint. The letter did not imply that Hutto was sexually harassing Arnold,[17] and is irrelevant as to whether USSC acted promptly to correct the allegedly sexually harassing behavior of a supervisor once USSC was notified of such conduct by plaintiff.

This Court finds that once Arnold notified USSC of alleged sexual misconduct by Hutto, USSC responded promptly and effectively. See Moayedi v. Compaq Computer Corp., 98 Fed. Appx. 335, 338 (5th Cir. 2004) (not selected for publication) (employer acted reasonably and quickly in investigating harassment complaint and firing offending perpetrator within three weeks after harassment reported). Accordingly, defendants have met their burden of proving the first element of their affirmative defense.

---

[16]Plaintiff's allegations in her Opposition to defendants' Motion for Summary Judgment, see p. 36, to the contrary that in October 2006 Hutto brushed up against her and asked for a "cookie," Hutto's way of requesting/demanding oral sex, are unsupported by record evidence. Plaintiff's May 13, 2008 affidavit, ¶28, merely recounts the episode occurring at Arnold's home on October 18, 2006. Plaintiff has pointed the Court to no other competent summary judgment evidence to establish that a genuine issue of material fact remains that Hutto's harassment continued during USSC's investigation of Arnold's complaint.

[17]The July 3, 2006 letter, signed by "A very Loyal Employee" and addressed to DiGiorgio, generally alleges that Hutto had been forcing women to perform sexual act on him to obtain or retain a job. DiGiorgio 10/24/07 Depo., pp. 83-84, Exh. P-4. The anonymous author specifically names three individuals as having been sexually harassed by Hutto, but only mentions Arnold's name once in a list of "other women [DiGiorgio] should talk to . . . if these women will talk." Id.

2. *Employee's Unreasonable Failure to Take Advantage of Preventive or Corrective Opportunities or to Avoid Harm Otherwise.*

The evidence before this Court, taken in the light most favorable to plaintiff, shows that plaintiff went to dinner with Hutto twice in 2005, once prior to May and once on Arnold's birthday in August. D. Arnold 5/13/08 Aff., ¶15. Arnold attended these dinners based on Hutto's false assurances that other employees would be present. Id. In October or November 2005, Hutto invited Arnold to watch a movie at his trailer on a Saturday night and Arnold accepted. Defendants' SUF, ¶23; Plaintiff's Response to Defendants' SUF, ¶23. Hutto picked Arnold up and took her to his trailer. Id., at ¶24. That night Hutto physically forced Arnold to, and threatened Arnold with her job if she did not, perform oral sex on him. D. Arnold 5/13/08 Aff., ¶16.

On two other occasions, the last of which occurred in April or May of 2006, Hutto allegedly instructed Arnold to bring files to Hutto's trailer. Id., at ¶¶17, 18; Defendants' SUF, ¶32; Plaintiff's Response to Defendants' SUF, ¶32. Each time after entering the trailer, Hutto again forced Arnold to perform oral sex on him. D. Arnold 5/13/08 Aff., ¶¶17, 18; Defendants' SUF, ¶34; Plaintiff's Response to Defendants' SUF, ¶34.

Arnold asserts that in April 2005, Hutto began touching her on the shoulder or back in a seemingly innocent manner but that his touching thereafter was inappropriate and continued until she complained in October 2006. D. Arnold 5/13/08 Aff., ¶14; Defendants' SUF, ¶36; Plaintiff's Response to Defendants' SUF, ¶36. Arnold also asserts that Hutto made sexually inappropriate comments toward her, told offensive jokes of a sexual nature in her presence and made sexual comments about Arnold to other employees. D. Arnold Depo., pp. 232-39. Arnold further claims that Hutto "fired [her] every Sunday . . . because she wouldn't come over there on Saturdays and

20

perform the oral sex to service him." Id., at pp. 225-26. Arnold admits that after she stopped performing oral sex on Hutto, she was not fired but Hutto "became real, real mean" with her and continued to touch her. Id.

Arnold admits having complained to her physician and an attorney of sexual harassment by Hutto as early as May 2005. By Arnold's account, she suffered three encounters of a sexual nature, multiple threats and multiple sexual propositions, among other things, yet never reported any of the incidents until months after the last dated incident in May 2006.

Plaintiff alleges, in part, that she did not know the identity, location or e-mail addresses of those to whom she was required to report sexual harassment under defendants' Harassment Prevention Policy. Plaintiff's allegations are disingenuous, at best, as the undisputed facts show that once Arnold was ready to complain of Hutto's sexually harassing behavior, she managed to find the right people.

The evidence before this Court establishes that Arnold unreasonably failed to take advantage of the preventive and corrective measures made available by USSC. See Casiano, 213 F.3d at 287 (employee unreasonably failed to take advantage of employer-provided preventive or corrective opportunities when he suffered at least fifteen propositions over a four-month period but never reported any of the incidents until months after the last one); see also Scrivner v. Socorro Ind. Sch. Dist., 169 F.3d 969, 971 (5th Cir. 1999) (employee failed to reasonably avail herself of employer's preventive and corrective sexual harassment policies, in part, because "from the summer of 1995 to March 1996, [the plaintiff] never complained about [her principal's] increasingly offensive behavior.").

As the Court finds that defendants have met their burden of proving they are entitled to the

benefit of the Ellerth/Faragher defense, Arnold's sexual harassment claims must be dismissed.

## II.     Title VII Retaliation Claim.

Arnold asserts that her employment with USSC was terminated on April 25, 2007, in retaliation for her filing a charge of sexual harassment with the Equal Employment Opportunity Commission ("EEOC") in October, 2006.

"A plaintiff establishes a prima facie case for unlawful retaliation by proving (1) that she engaged in activity protected by title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir.1996). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to demonstrate a legitimate, non-retaliatory reason for the adverse employment action. Id., at 304-05. If the defendant produces such evidence, "the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff." Id., at 305.

For purposes of their motion, defendants concede that Arnold engaged in a protected activity by filing the EEOC Charge, and that Arnold suffered the adverse employment action of termination. Defendants assert, however, that plaintiff cannot come forward with evidence tending to establish causation. In particular, defendants point out the existence of a six-month gap between the time Arnold filed the EEOC Charge and her termination.

The evidence before this Court shows that Arnold signed her EEOC Charge against her employer alleging sexual harassment on October 30, 2006. Plaintiff's Opp., Exh. Q, EEOC Charge. It is undisputed that Arnold's employment was not terminated until April 25, 2007. Defendants' SUF, ¶72; Plaintiff's Response to Defendants' SUF, ¶72.

Plaintiff asserts, without support, that "[b]y December 13, 2006, the Defendants were aware of" Arnold's EEOC Charge. Plaintiff's Opp., p. 41. Plaintiff offers no evidence upon which to base the December date. Plaintiff further asserts that the fact of retaliation can be inferred from pretext, and that the reasons provided by defendants for her termination allow for such an inference. This Court disagrees.

Plaintiff offers her affidavit in support of causation, and states that Hester suggested she drop her case against USSC since Hutto had been fired. D. Arnold 5/13/08 Aff., ¶49. Plaintiff asserts that she was never reprimanded or counseled for the violations listed as the bases for Arnold's termination in her Record of Exit Interview Form[18] despite USSC's "professed preference" for progressive discipline. Plaintiff's Opp., p. 42, citing USSC's Employment Handbook. Plaintiff states in her affidavit that Hester told her he was satisfied with her job performance and that she need not worry about her job. D. Arnold 5/13/08 Aff., ¶49.

"[E]vidence of temporal proximity alone cannot sustain an inference of causation when there is a six-month gap between the protected activity and the alleged adverse employment action." Russell v. Univ. of Tex. of the Permian Basin, 234 Fed. Appx. 195, 207 (5th Cir. 2007) (not selected for publication). However, the Fifth Circuit, in Shirley v. Chrysler First, Inc., 970 F.2d 39, 43 (5th Cir. 1992), found a fourteen-month gap sufficient to establish a causal nexus when the plaintiff presented evidence that her boss complained to her about the EEOC complaint at least twice a week, "harassed her to death about it," and made disparaging comments about the plaintiff's EEOC

---

[18]Arnold's Record of Exit Interview indicates that her employment was terminated for unsatisfactory work performance related to: attendance, reliability, excessive use of personal cell phone while on duty, poor interpersonal and management skills and safety based on observation of Arnold in an incoherent and/or incapacitated state while on duty. Plaintiff's Opp., Exh. H.

complaint. The <u>Shirley</u> Court also looked to evidence that criticisms of the plaintiff's work performance only arose after she filed the complaint. <u>Id.</u> The case <u>sub judice</u> falls somewhere in the middle.

In this case, plaintiff relies not only on temporal proximity but also on Hester's comment that she should drop her case against USSC and that she was never reprimanded prior to her termination for the conduct upon which her termination was allegedly based. The Court finds that plaintiff's assertions are sufficient to create a genuine issue of fact and defeat summary judgment as to plaintiff's retaliation claim.

## III.    Conspiracy Claim Under La. R.S. 51:2231, *et seq.*

Arnold asserts that defendants are liable under state law for "aiding and abetting in the facilitation of sexual harassment under La. R.S. 51:2231, <u>et seq.</u>" Amended Complaint, ¶¶14-15. Defendants assert that no such claim exists under Louisiana law.

This Court agrees with the reasoning in <u>Smith v. Parish of Washington</u>, 318 F.Supp.2d 366, 371-74 (E.D.La. 2004), that led the district court to the conclusion that liability under La. R.S. 51:2256 is "limited to retaliation against practices made unlawful under the Louisiana Human Rights Act," <u>id.</u>, at 373, <u>i.e.</u>, discriminatory practices in public accommodations and advertising public accommodations (La.R.S.51:2247), against breast-feeding mothers (La.R.S.51:2247.1), by financial institutions in providing financial services (La.R.S.51:2254) and in credit transactions (La.R.S.51:2255), as did the only Louisiana appellate court to construe La. R.S. 51:2256 since the 1997 amendments. <u>See</u> <u>Lowry v. Dresser, Inc.</u>, 893 So.2d 966, 967-68 (La. App. 3 Cir. 2005). In creating the Louisiana Employment Discrimination Law, La. R.S. 23:301, <u>et seq.</u>, the Louisiana legislature chose to include specific anti-retaliation provisions only in those sections addressing age

24

discrimination (La. R.S. 23:311-314) and sickle-cell trait discrimination (La. R.S. 23:351-354).

Arnold's retaliation claim stems from her accusing her former supervisor of sexual harassment which does not fall within any of the aforementioned categories. Accordingly, plaintiff's state law claim of conspiracy to retaliate is **DISMISSED**.

## CONCLUSION

For the reasons stated above, plaintiff has failed to meet her burden of proof on summary judgment as to her sexual harassment claims but has raised a genuine issue of material fact regarding her retaliation claim. Accordingly, plaintiff's sexual harassment claims are **DISMISSED** but her Title VII retaliation claims remain. Further, as explained above, plaintiff's state law claims are also **DISMISSED**.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE